IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEBORAH CHUK,  )
  )
    Plaintiff,  )
  )
  )   No. 14 C 2525
v.  )
  )   Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting  )
Commissioner of Social Security,  )
  )
    Defendant.  )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Deborah Chuk moves for reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of Disability Insurance Benefits ("DIB") (doc. # 13). The Commissioner has filed a motion for summary judgment, asking that we affirm the Commissioner's decision (doc. # 20). Plaintiff has filed her reply (doc. # 25), and so now the matter is fully briefed. For the following reasons, we grant Plaintiff's motion and remand the case.

I.

Ms. Chuk applied for DIB on May 12, 2011, alleging an onset date of December 29, 2010 (R. 151). Her date last insured is September 30, 2011 (R. 85). After her claims were denied initially (R. 75, 82), Ms. Chuk participated in a hearing before Administrative Law Judge ("ALJ") Denise McDuffie Martin on September 18, 2012 (R. 43). Ms. Chuk, who was represented by counsel, testified at the hearing, as did medical expert Joseph Cools, Ph.D., and

---

[1]On April 25, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 7).

vocational expert, Grace Gianforte (R. 45). On October 26, 2012, the ALJ issued her decision, denying Ms. Chuk's claim for benefits (R. 26-38). The Appeals Council denied Ms. Chuk's request for review of the ALJ's decision on December 5, 2013, making the ALJ's ruling the final decision of the Commissioner (R. 1-3, 7-9). *See Shauger v. Astrue*, 675 F. 3d 690, 695 (7th Cir. 2012).

## II.

We first summarize the administrative record. Part A reviews Ms. Chuk's medical history, Part B reviews the hearing testimony and Part C summarizes the ALJ's opinion.

### A.

Ms. Chuk was born on January 2, 1963. She stopped working in January 2007 to take care of her elderly mother, who subsequently passed away in August 2010 (R. 174). Ms. Chuk alleges an onset date of December 29, 2010, claiming she was unable to return to work after her mother's passing because her symptoms of depression, anxiety, and obsessive-compulsive disorder ("OCD") worsened (*Id.*).

The record does not contain any medical records for the period before Ms. Chuk's alleged onset date. On January 31, 2011, Ms. Chuk underwent a psychiatric evaluation at Metropolitan Family Services with a psychiatrist, Andrea Bacon, M.D. (R. 246). At the appointment, Ms. Chuk complained of trouble sleeping, low energy, poor concentration and a decreased appetite (R. 244). Ms. Chuk also reported having suicidal ideations in which she wished she might get sick and die, but no suicidal intentions or plans (*Id.*). She also reported having the compulsive need to arrange items and check and recheck things, such as whether the stove was turned off (*Id.*). These behaviors often caused her to be late (*Id.*).

Dr. Bacon diagnosed Ms. Chuk with major depressive disorder and OCD, and noted that she also had a history of hyperthyroidism, grief, and financial problems (R. 245). Dr. Bacon prescribed Zoloft to treat Ms. Chuk's depression and obsessive-compulsive behavior (R. 246).[2] Ms. Chuk subsequently returned to see Dr. Bacon for 15-minute medication management appointments in February, May and June 2011. At these appointments, she reported symptoms of depression, anxiety with reactive effect, and feeling groggy during the day (R. 247-249). Dr. Bacon continued to diagnose Ms. Chuk as suffering from major depressive disorder and OCD; at the May 2011 appointment, Dr. Bacon's notes indicate that there has been "little change" with respect to these conditions (R. 248).

In July 2011, Ms. Chuk began treating with a different psychiatrist, Morris Blount, M.D., because Dr. Bacon left Metropolitan Family Services (R. 282). Her treatment with Dr. Blount, as it had been with Dr. Bacon, consisted of short, monthly appointments to discuss medication management (*Id.*). At appointments in September and November 2011, Dr. Blount noted that Ms. Chuk's mood was "okay" and that she was stable; she told Dr. Blount in September 2011 that she had not been feeling depressed although she was frustrated about her financial problems (R. 281). Ms. Chuk did not see Dr. Blount again until February 2012, when he judged her relatively stable. At her next appointment in May 2012, her medications were working and she was not feeling depressed (R. 305-06).

Ms. Chuk also underwent a number of consultative examinations as part of her application for disability benefits. On August 30, 2011, a consultative psychiatrist, Henry Fine, M.D., examined Ms. Chuk and reviewed her medical record (R. 252). Dr. Fine concluded that Ms. Chuk had multiple psychiatric symptoms resulting in major depression with suicidality and

---

[2]Dr. Bacon's notes refer to "restarting" Ms. Chuk on Zoloft, which she had first started taking five months previously, but stopped because she was unable to afford it. The medical record contains no information about who first prescribed the medication or what mental health treatment Ms. Chuk had received prior to seeing Dr. Bacon.

anxiety features, as well as "clear panic disorder with agoraphobia, and obsessive compulsive behavior" (R. 255). Dr. Fine noted that none of Ms. Chuk's psychiatric symptoms appeared to have been a significant factor in her work history "to this date" (*Id.*).

On September 13, 2011, a state agency consultant, Tyrone Hollerauer, Psy.D., reviewed Ms. Chuk's medical record to assess her alleged impairments (R. 257-69). Dr. Hollerauer completed a Residual Functional Capacity ("RFC") form for Ms. Chuk, opining that she had moderate limitations in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence and pace, and had experienced no instances of decompensation (R. 267). Dr. Hollerauer judged that Ms. Chuk was not significantly limited in tasks related to understanding and memory, and had either mild or moderate limitations in tasks related to sustained concentration and social interaction (R. 271-72). He also opined that Ms. Chuk was not significantly limited in her ability to adapt to change (*Id.*). Dr. Hollerauer concluded that Ms. Chuk was depressed, anxious and had an obsessive personality, and was not responding particularly well to medications, but that she maintained the ability to perform simple and routine tasks (R. 273). On February 15, 2012, Dr. Hollerauer's opinions were confirmed in a record review by another state agency consultant, Glen Pittman, M.D. (R. 296-98).

On August 6, 2012, Dr. Blount completed a mental impairment questionnaire about Ms. Chuk (R. 302). Dr. Blount concluded that Ms. Chuk had a slight restriction in her activities of daily living, moderate difficulty in maintaining social functioning, and would "often" have deficiencies of concentration, persistence or pace, including episodes of deterioration or decompensation in work or work-like settings "once or twice" (R. 304). Elsewhere on the form, Dr. Blount assessed Ms. Chuk as having a "good" ability to perform unskilled work but that she also had "lingering poor concentration" (R. 303). Dr. Blount categorized Ms. Chuk's ability to

4

carry out short and simple instructions, maintain her attention for two hours at a time, show regular attendance, and complete a normal workday without interruption from symptoms as only "fair," meaning that her ability to function in these areas was "severely limited but not precluded" (*Id.*).

**B.**

At the hearing before the ALJ on September 18, 2012, Ms. Chuk was 49 years old. Ms. Chuk testified that after her mother's death she was unable to return to work due to anxiety about leaving the house and lack of concentration, and that these symptoms were worsening with time (R. 48). Ms. Chuk stated that she first sought treatment in January 2011 after having suicidal ideations for the prior two months (*Id.*).

Ms. Chuk testified that she leaves her home only when she is completely out of food and to attend church several times per month (R. 58). She reported that her symptoms include anxiety and panic attacks which "will hit [her] out of nowhere" (R. 51), and last around 15 to 20 minutes with a reoccurrence of three to four times per week (R. 52). Ms. Chuk testified that she struggles to focus and that running late for work was a problem at her last job (R. 53). She testified that her concentration improves when she is listening to music or when she is writing (*Id.*). Ms. Chuk further stated that her OCD causes her to be afraid of germs, which she alleges is a difficulty in the work place since she has to have some level of contact with people (R. 54). Upon questioning by the ALJ about household chores, Ms. Chuk stated that she is capable of doing her own laundry and miscellaneous household chores about once month, and washes her dishes a few times per week (R. 57). In terms of her social life, Ms. Chuk testified that she has a few lifelong friends, although she does not get to see them as often as she would like (R. 58).

The ALJ next heard the testimony of a licensed clinical psychologist, Joseph Cools, Ph.D., who served as the medical expert (R. 59). Dr. Cools testified that the symptoms of someone with obsessive-compulsive disorder are unavoidable and that anxiety can result from not performing the rituals associated with the compulsion (R. 60). Dr. Cools testified that Ms. Chuk's compulsive rituals include cleaning her house, making sure everything is in order, obsessive hand washing, and "checking behaviors" such as checking door locks and the stove repeatedly (R. 60). Dr. Cools opined that such compulsive behaviors take up a "great deal of her time," and would cause her to be late to work consistently (R. 61). Further, while Ms. Chuk's recent memory was not a problem, her lack of concentration prevented her from absorbing information into "memory storage" and thus inhibited her ability to later access it (*Id.*). Dr. Cools noted that Ms. Chuk's medical records indicate that she has difficulty concentrating, and that she exhibits social withdrawal, guilt, persistent anxiety, appetite disturbance and psychomotor agitation (R. 63). Dr. Cools opined that Ms. Chuk's ability to maintain concentration, pace, and persistence was perhaps the most limiting of her impairments, and could rise to the level of a marked restriction during periods of stress, when Ms. Chuk's anxiety component "kicks in" and concentration becomes difficult (R. 65).

The ALJ asked Dr. Cools about the form completed by Dr. Blount, in which he assessed as "fair" Ms. Chuk's ability to carry out short and simple instructions, maintain attention for two hours at a time, show regular attendance, and complete a normal workday without interruption. Dr. Cools noted that these assessments were "just the checkmarks" on a pre-printed form, and what he would "look at is the narrative description more than just the checkmarks. Because what might be fair to me might be good to someone else or might be poor to someone else, so it's good to have a description too" (R.63). Dr. Cools stated that according to his review of the entire

medical record, if Ms. Chuk was to work, she would probably be off task on average five to ten minutes per hour, and that she would miss up to two days of work per month (R. 65).

The ALJ also heard testimony from a vocational expert, Grace Gianforte. The ALJ asked Ms. Gianforte to assume a hypothetical individual of Ms. Chuk's age, education and work history who had no exertional limitations but who would be limited to unskilled, simple, routine, repetitive tasks, with brief and superficial interactions with supervisors, coworkers and the public and who would not be subject to fast paced production quotas (R. 69-70). Ms. Gianforte opined that such a person could perform jobs such as laundry sorter, dining room attendant, or housekeeper (*Id.*). Ms. Gianforte also testified that a person who is off task for five to ten minutes per hour would not be tolerated in an unskilled job (R. 71). Further, Ms. Gianforte testified that an individual who would be absent from work once or twice a month would not be able to work any of the jobs she listed (R. 71).

## C.

On October 26, 2012, the ALJ issued a 13-page written decision finding Ms. Chuk not disabled and denying her benefits (R. 26-38). In evaluating Ms. Chuk's claim, the ALJ used the traditional five-step sequential evaluation process for determining disability. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a). This process requires the ALJ to consider: (1) whether the claimant has engaged in any "substantial gainful activity" since the alleged disability onset date; (2) if her impairment or combination of impairments is severe; (3) whether her impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) whether her residual functional capacity ("RFC") prevents her from performing past relevant work; and (5) if her RFC prevents her from performing any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4), (b)-(f); 416.920(a). The claimant bears the burden of

proof at Steps 1 through 4; the burden then shifts to the Commissioner at Step 5. *Weatherbee v. Astrue,* 649 F.3d 565, 569 (7th Cir. 2011).

At Step 1, the ALJ found that Ms. Chuk had not engaged in substantial gainful activity since her alleged onset date of December 29, 2010 (R. 28). At Step 2, the ALJ found that Ms. Chuk had the following severe impairments: depression, anxiety, and obsessive-compulsive disorder (*Id.*).

At Step 3, the ALJ concluded that Ms. Chuk's mental health impairments, alone or in combination, did not meet or equal the requirements of Listing 12.04 and 12.06, considering the criteria of "Paragraph B" and "C" (R. 28).[3] The ALJ found that Ms. Chuk had a moderate restriction in her activities of daily living because, despite her OCD and agoraphobia, she was able to take care of her personal grooming and hygiene (and she was appropriately groomed at the hearing), and testified that she performed household chores, prepared simple meals, cleaned her home, and went grocery shopping (R. 29). In making that finding, the ALJ acknowledged that Ms. Chuk gets overwhelmed when presented with tasks such as thorough cleaning, only goes grocery shopping when "she is really in need of items," and struggles to motivate herself to go outside her home due to her anxiety about leaving home (*Id.*).

The ALJ judged Ms. Chuk to have moderate difficulty with social functioning because, although she testified that she did not like to get too close to other people and avoided actual physical contact with them, she attended church, shopped in grocery stores, and had lifelong friends (R. 29). The ALJ found that Ms. Chuk had moderate difficulties with concentration and

---

[3]To satisfy the criteria of paragraph B the mental impairments should meet at least two of the following restrictions: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation is more than moderate but less than extreme; and repeated episodes of decompensation means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

persistence or pace, as evidenced by her testimony that she is easily distracted and has trouble completing tasks, which causes her to be late (R. 30). At the same time, the ALJ noted Ms. Chuk's testimony that she spent her days doing paperwork and could follow directions "pretty well" (*Id.*). The ALJ also made specific reference to the fact that Ms. Chuk's field officer did not report noticing that Ms. Chuk had any difficulties with understanding, coherency, concentrating, talking or answering questions or filling out forms during their face-to-face intake interview (*Id.*). The ALJ explained that while Ms. Chuk's ability to fill out Social Security forms and participate in a face-to-face interview did not negate the alleged severity of Ms. Chuk's symptoms, they were relevant factors in reaching a conclusion about the credibility of Ms. Chuk's allegations (*Id.*). The ALJ also found that Ms. Chuk had not experienced repeated episodes of decompensation and concluded that Ms. Chuk's mental impairments "did not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation" so that paragraph B criteria was not satisfied" (R. 31).

Having found that Ms. Chuk's severe impairments did not meet or equal a Listing, the ALJ then considered Ms. Chuk's RFC. The ALJ found that Ms. Chuk's RFC allowed her to perform "a full range of work at all exertional levels but with the following non-exertional limitations: unskilled, simple, routine, repetitive, tasks with brief and superficial interactions with the public, co-workers, and supervisors; and no fast paced production or quotas" (R. 31). To support her RFC determination, the ALJ summarized Ms. Chuk's symptoms as reported by Ms. Chuk to various medical professionals and also as she described them at the hearing (R. 32-33). The ALJ then concluded that Ms. Chuk's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 34).

The ALJ also summarized the opinions of the various doctors, both treating and consultative, who examined Ms. Chuk or reviewed the medical record (R. 33-34). The ALJ stated that Dr. Cools' opinion was not "convincing, or consistent with the medical evidence of record as a whole," and thus, she gave "no considerable weight" to it (R. 36). In rejecting Dr. Cools' opinion, the ALJ found it "significant" that at medication management appointments in February and May 2012, Ms. Chuk reported that she was sleeping and eating well and not feeling depressed (R. 36). The ALJ did not expressly state the weight she gave the opinions of the other medical professionals in the record (Drs. Bacon, Blount, Fine and Hollerauer), but stated that "the limits assessed by Dr. Cools are much greater than those apparent from the report of the claimant's treating doctor," who was Dr. Blount (*Id.*). The ALJ also stated that "the limits [Dr. Blount] identified have been accommodated within the residual functional capacity that I have assessed" (R. 35).[4]

At Step four, the ALJ found that through the date last insured, Ms. Chuk was unable to perform any past relevant work as a sales clerk or cashier/customer service clerk (R. 37). The ALJ noted that the vocational expert testified that an individual with the claimant's RFC, age, education, and work experience would not possess the exertional/non-exertional requirements needed to perform her prior work (*Id.*). But, at Step five, the ALJ concluded that through the date last insured, considering the claimant's age, education, work experience, and RFC, there were

---

[4]The ALJ also recited the testimony of Ms. Annette Wall, Ms. Chuk's sister, who reported that Ms. Chuk had "always" needed to take 3–4 hours to get ready for work and that Ms. Chuk had not been out of the house for weeks because she could not manage daily tasks (R. 33). Similarly, the ALJ summarized statements by Ms. Chuk's brother Joseph R. Chuk, who reported that Ms. Chuk has "gradually found it more difficult to leave the house," and has become more forgetful (*Id.*). The ALJ did not explain what weight she gave to this testimony.

jobs that existed in significant numbers in the national economy that the claimant could perform, such as dining room attendant and laundry sorter (R. 38).

**III.**

We review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal citations omitted). We do not reweigh evidence or substitute our own judgment for that of the ALJ. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ "must build a logical bridge from the evidence to her conclusion, but she need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

Because Ms. Chuk's onset date is December 29, 2010 and her date last insured is September 30, 2011, she must be found disabled between those two dates to be eligible for benefits. *Shideler*, 688 F.3d at 311. In this case, Ms. Chuk argues for reversal or remand for two reasons: she claims that (1) the ALJ erred when she improperly rejected Dr. Cools' opinion before concluding that Ms. Chuk was not disabled (Pl.'s Mem. at 8), and (2) the ALJ did not properly evaluate the credibility of Ms. Chuk's allegations (*Id.* at 12). We address each argument in turn.

were jobs that existed in significant numbers in the national economy that the claimant could perform, such as dining room attendant and laundry sorter (R. 38).

## III.

We review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal citations omitted). We do not reweigh evidence or substitute our own judgment for that of the ALJ. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ "must build a logical bridge from the evidence to her conclusion, but she need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

Because Ms. Chuk's onset date is December 29, 2010 and her date last insured is September 30, 2011, she must be found disabled between those two dates to be eligible for benefits. *Shideler*, 688 F.3d at 311. In this case, Ms. Chuk argues for reversal or remand for two reasons: she claims that (1) the ALJ erred when she improperly rejected Dr. Cools' opinion before concluding that Ms. Chuk was not disabled (Pl.'s Mem. at 8), and (2) the ALJ did not properly evaluate the credibility of Ms. Chuk's allegations (*Id.* at 12). We address each argument in turn.

## A.

Ms. Chuk argues that the ALJ erred in rejecting Dr. Cools' opinion without providing sufficient reasoning in her decision (Pl.'s Mem. at 8- 11). We agree; indeed, we conclude that the ALJ's entire treatment of the medical opinions in the record is deficient.

The so-called "treating physician rule" requires an ALJ to give controlling weight to the opinion of a social security claimant's treating physician if it is well-supported by and not in conflict with other substantial medical evidence in the record. 20 C.F.R. § 404.1527(d)(2). If the ALJ rejects the opinion of a treating doctor, she must justify that decision by considering a list of factors including the length, nature and extent of the treatment relationship, the physician's specialty, the frequency of examination, diagnostic tests performed, and consistency and supportability of the physician's opinion. *Id.; Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).

As an initial matter, it is not clear from the opinion what weight the ALJ gave the opinions of Drs. Blount or Bacon, Ms. Chuk's treating physicians. The ALJ's opinion summarizes Ms. Chuk's medical history, including the four medical opinions in the record, but only assigns a weight to that of the medical expert, Dr. Cools, whose opinion she rejects. Instead of assigning a weight to the opinion of Ms. Chuk's treating doctors, the ALJ merely says that she accounted for Dr. Blount's limits in her RFC determination. This is problematic for two reasons.

*First,* even if we read the ALJ's decision as assigning controlling weight to Dr. Blount's opinion, she does not explain which of Dr. Blount's limits she incorporated into her RFC. Given that Dr. Blount's RFC does not explicitly opine that Ms. Chuk is able to work, we have no way to assess how the ALJ used that opinion to form her own RFC determination.

*Second,* the ALJ fails to explain how Dr. Blount's opinion differs from that of Dr. Cools, which the ALJ rejects for including limits she criticized as "much greater than those apparent

12

from the report of the claimant's treating doctor" (R. 36). The ALJ does not describe (or even identify) which of Dr. Cools' limits are greater than those of Dr. Blount's. Nor does the ALJ explain how – in her view – Dr. Blount's assessment differed with that of Dr. Cools.

Dr. Blount opined that Ms. Chuk had only a "fair" ability (out of a range from very good, good, fair, and poor/none) to maintain attention for two-hour segments, maintain regular attendance, and complete a normal workday and work week without interruption from her psychologically based symptoms. On the pre-printed form that Dr. Blount completed, "fair" is defined as meaning that the patient is "seriously limited but not precluded" (R. 303). The ALJ failed to explain why this assessment undermines Dr. Cools' opinion that Ms. Chuk's ability to maintain concentration, pace, and persistence was her most limiting difficulty, that Ms. Chuk would likely be off task on average five-to-ten minutes per hour, and that she would miss up to two days of work per month.

No other medical opinion unequivocally contradicts this assessment. While Dr. Hollerauer opines that Ms. Chuk retained the ability to "do simple routine tasks" (R. 273), his mental RFC assessment does not contain any opinion about Ms. Chuk's ability to work on a sustained basis. Dr. Fine offered no opinion about Ms. Chuk's ability to work. Although the ALJ cited to Dr. Fine's observation that none of Ms. Chuk's mental health issues appeared to have been a factor in her work history to date (R. 35), the work history to which Dr. Fine refers ended in 2007. Ms. Chuk had no employment thereafter, and thus, Dr. Fine's comment does not speak to the effect of Ms. Chuk's severe impairments on her ability to work beginning with her onset date in 2010.

Perhaps the ALJ concluded that because the form completed by Dr. Blount defined "fair" to mean that a person is "severely limited but not precluded" from performing a task, this meant

that the limitations he noted were not disabling. However, that is not the only conclusion to be drawn from that form, and the ALJ's opinion gives no basis for us to know whether she considered alternative conclusions and, if so, why she rejected them.

For example, to say that a severe limitation does not altogether "preclude" a certain activity is not on its face the same thing as saying that a person could perform that activity with the regularity required by full-time employment. Moreover, Dr. Blount found this level of limitation not just in one, but in four important categories of activity; the ALJ's opinion gives no evidence that she considered the cumulative effect of these limitations on Ms. Chuk's ability to perform full-time work on a consistent basis. The ALJ also failed to grapple with an important point developed during the testimony of Dr. Cools during the hearing: that a narrative explanation of how Dr. Blount assessed the limitations would have been more illuminating than merely relying on checked boxes (R. 63). The ALJ could have asked Dr. Blount for a further explanation of the limitations, which would have given her a more sound basis to decide whether there was any meaningful difference between Dr. Blount's assessment and that of Dr. Cools. The ALJ's failure to do any of these things makes her conclusory dismissal of Dr. Cools' opinion unsupportable.

Moreover, the ALJ discredits Dr. Cools because his opinion supposedly conflicts with two 15-minute appointments with Dr. Blount that occurred after Ms. Chuk's date last insured in which she reported not feeling depressed. In so doing, the ALJ ignores other appointments during the claims period that reflect more severe symptoms, such as Ms. Chuk's appointment with Dr. Bacon in May 2011 that reflected little change from her initial symptoms, even while on medication. An ALJ has "the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability . . ." *Denton v. Astrue,* 596 F.3d

419, 425 (7th Cir. 2010). And even if we accept the notion that, as of February 2012, Ms. Chuk's depression had improved, such improvement does not necessarily suggest an ability to work. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir.2008). Indeed, Dr. Blount's mental health assessment, which opined that Ms. Chuk only had a "fair" ability to perform significant functions necessary to full-time work, occurred six months later, in August 2012.[5]

The dismissive treatment of Dr. Cools' opinion is not only unsupported by any analysis the ALJ offers, but it is also surprising because Dr. Cools appeared at the hearing as a medical expert at the ALJ's request. The Social Security Regulations require an ALJ "to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). If the ALJ rejects a medical source on the ground that it is inconsistent with other medical evidence, he or she must provide a sound explanation for that decision. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013), *see also, Fuchs v. Astrue,* 873 F.Supp.2d 959, 969 (N.D.Ill. 2012) (holding ALJ erred in rejecting opinion of testifying medical expert because ALJ did not support his reasons with medical evidence).

If all the medical evidence was as one-sided against a finding of disability as the ALJ suggests, there would have been no need to solicit testimony – at a financial expense to the agency – from a medical expert. The presence of the medical expert suggests that there was evidence in the medical record that the ALJ required assistance in sorting out. This is all the more reason that the ALJ was not entitled to jettison the medical expert testimony she sought out by stating (without explanation) that it was contrary to Ms. Chuk's treating physician.

---

[5]In addition, Dr. Blount's notes from the medication management appointments in 2012 that reflect that Ms. Chuk was not feeling depressed do not discuss her agoraphobia or OCD; it is these impairments which Dr. Blount and Dr. Cools opine contribute to Ms. Chuk's inability to hold a full-time job.

We recognize that the ALJ's opinion contains a lengthy summary of the medical record. But, summarizing a medical history is not the same thing as analyzing it, in order to build a logical bridge from evidence to conclusion. *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480 (N.D.Ill. May 6, 2015) (Schenkier, J.). While the ALJ may have discerned significant differences in the opinions of Drs. Cools and Blount (and Fine and Holleraurer for that matter), she does not articulate them in her decision, and so we find no logical bridge from the evidence to the RFC. *See, e.g., Roddy*, 705 F.3d at 636 (ALJ's failure to articulate why he credited one doctor's opinion over another was reversible error).

## B.

Because it implicates the same problem of summarizing but not analyzing the evidence, we also find that the ALJ's credibility analysis is flawed. An ALJ's credibility determination is entitled to deference because the ALJ is in the best position to hear and observe the witness and therefore assess credibility firsthand. *See Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014). Therefore, we will overturn a credibility determination only if it is patently wrong; that is, if the decision lacks any support or explanation. *Id., citing Elder v. Astrue,* 529 F.3d 408, 413-14 (7th Cir. 2008).

In assessing Ms. Chuk's credibility, the ALJ invokes the oft-criticized boilerplate language that "claimant's statements concerning the intensity, persistence and limiting effect of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 34). The Seventh Circuit has cautioned that this phrase is "meaningless," because it fails to explain what the ALJ relied upon in making her determination. *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013). But use of the boilerplate language does not

automatically undermine an ALJ's credibility determination, if she also points to specific information in the record to support the assessment. *Id.* at 367-68.

But, in this case, the ALJ did not supplement her boilerplate statement with a description of what parts of Ms. Chuk's testimony she found not credible. While the ALJ described Ms. Chuk's testimony about her ability to do paperwork, complete household tasks and go to church in her analysis of the Paragraph B factors, the ALJ did not explain how this testimony suggests an inconsistency, exaggeration or untruthfulness with respect to Ms. Chuk's testimony concerning the extent of her mental health issues and their effects on her ability to work.[6] Additionally, the ALJ failed to explain how the ability to perform certain tasks in the comfort of her own home, at her own pace, showed that Ms. Chuck was not credible when describing limitations that, as Dr. Cools explained, would "kick in" during periods of stress – which might reasonably be expected to occur at a full time job. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

Similarly, although the ALJ notes that Ms. Chuk's lack of difficulty completing her benefits application undergoing a face-to-face interview could bear on her credibility, she does not explain how she weighed Ms. Chuk's credibility against the backdrop of these activities or otherwise give a reason for questioning her credibility. *See Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011) (use of boilerplate statement useless for credibility determination where ALJ failed to explain which of Plaintiff's statements were not credible or weigh how credible or non-credible they were). On remand, the ALJ should take care to engage in the required analysis and explanation of her credibility decisions.

---

[6]Ms. Chuk's testimony about her abilities are arguably consistent with her testimony about the difficulties caused by her mental health issues; while she testified that she could in fact leave her house on occasion, such as when she was entirely out of food, she explained that it could take her several hours or longer to get ready. The ALJ points to no evidence in the record to contradict this testimony or to suggest that Ms. Chuk's OCD and agoraphobia were not as severe as she claimed.

## CONCLUSION

For the reasons stated above, we grant Ms. Chuk's motion to reverse and remand the ALJ's decision (doc. # 13) and we deny the Commissioner's motion to affirm the denial of benefits (doc. # 20). This case is remanded for further proceedings consistent with this ruling. The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATED:    October 30, 2015